**Walter Timothy STOREY, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. SC 85980.

Supreme Court of Missouri,
En Banc.

Oct. 18, 2005.

Rehearing Denied Nov. 22, 2005.

William J. Swift, Office of Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

## I. Introduction

Walter Timothy Storey was sentenced to death for the murder of Jill Frey, life-imprisonment for armed criminal action, seven years for burglary, and five years for tampering. Two previous juries had sentenced Storey to death. Those sentencing trials were reversed for evidentiary and counsel errors. *State v. Storey*, 986 S.W.2d 462 (Mo. banc 1999); *State v. Storey*, 901 S.W.2d 886 (Mo. banc 1995). This Court upheld the third sentencing on direct appeal. *State v. Storey*, 40 S.W.3d 898 (Mo. banc 2001). Storey now seeks post-conviction relief under Rule 29.15. He alleges 13 points of error with multiple subpoints, which allegedly denied him effective assistance of counsel, due process, and freedom from cruel and unusual punishment. The motion court denied post-conviction relief. This Court affirms.

## II. Background

### A. Factual background

On Friday, February 2, 1990, Storey became upset over his pending divorce. After finishing all of his beer, he decided to steal money for more beer from Ms. Frey, a special education teacher, who lived in a neighboring apartment. He climbed her balcony and entered an un-

locked sliding glass door. He stole her car keys, entered her bedroom, and, in his words, "struggled" with her.

Ms. Frey died of blood loss and asphyxiation from two neck wounds, which cut through both of her jugular veins, her airway, her esophagus, and into her spine. Before she lost consciousness, she had her eyelid torn off and suffered injuries to her forehead, nose, cheeks, scalp, lips, and tongue. She also had defensive wounds to her arms and hand. Ms. Frey suffered an abrasion on her right knee, a six-inch stab wound to her abdomen, four internal impact injuries to her head, and five fractured ribs. Storey struck Ms. Frey a minimum of twenty times before cutting her throat to the spine.

The next day he returned to her apartment, wiped it down, scrubbed Ms. Frey's fingernails, and attempted to remove any other incriminating evidence. When her body was found, she was lying face down in a pool of blood, naked below the waist, with her arms behind her back. The walls were splattered with blood, and her shirt had a tennis shoe imprint on it. The police found Storey's bloody palm print in the room. After searching the dumpster, the police also found Ms. Frey's briefcase along with a paper bag containing a bloody t-shirt, a tank-top, and a pair of white gloves. Ms. Frey's blood was on the gloves, and Storey's blood was on the t-shirt. Storey's sneakers also had blood on them.

## B. Evidence presented

In Storey's third sentencing trial, defense counsel decided to pursue a two-pronged strategy. First, evidence was presented to show all of the bad influences and discord that surrounded Storey's childhood. Second, evidence was presented to show Storey's good deeds and friendly disposition. Counsel presented several mitigating witnesses at trial. Mr. Aiken, an expert in the field of corrections and criminal justice, testified about Storey's non-violent prison record. He testified that Storey "can be safely housed and incarcerated in a correctional facility such as Potosi for the remainder of his life without presenting a risk of harm to inmates, staff or the community...." Regarding housing Storey for life in prison, "In my professional opinion, I have a higher probability of being in an earthquake than for him to violate a major rule violation." Judy Robart, Storey's boss at the Potosi Correctional Center library, testified that Storey had worked in the library with her for a year. She testified that while Storey worked for her, he got along with her and the other inmates "[j]ust fine. He had no problems that I'm aware of.... He did his job and he reported to his job every day."

Patricia Basler, Storey's mother, testified that Storey was physically, emotionally, and sexually abused by his stepfather as a child. She testified that from the time he was two to three years old, his stepfather beat him with "[b]elts, switches, tree limbs, electrical cords, fishing—fiberglass fishing rods, [and his] fist at times." She told how Storey's stepfather placed Storey in a nest of fire ants. Then she testified of all the nice things that Storey did as a child. She said "he had a big heart" and that he sends her flowers, cards, poetry, and letters from prison. Counsel introduced pictures of Storey's childhood to corroborate his good demeanor.

Dr. Gerald Vandenberg, a clinical forensic psychologist, testified that Storey was abused continually as a child. The earliest included an episode, where "[h]is father reportedly taped his hands to the crib and taped his mouth shut." Dr. Vandenberg testified that negligence and abuse "partic-

ularly in the first eighteen month[s] of life can be particularly devastating. That's the period in time in which the trust and security foundation of personality is shaky, everything else that is built on it from that point on is also in jeopardy." Dr. Vandenberg diagnosed Storey with a borderline personality disorder. Dr. Vandenberg testified that Storey did not have an antisocial personality disorder because he was not predatory. While on the stand, he was asked: "[D]id you find or believe that the murder of Jill Frey was committed while [Storey] was under the influence of extreme mental or emotional disturbance?" Dr. Vandenberg answered: "Yes. . . . [H]is ability to conform his behavior to the requirement of law was impaired." Regarding Storey's recovery from posttraumatic stress disorder, Dr. Vandenberg stated: "In '93 I also diagnosed [Storey with] a posttraumatic stress disorder characterized in part by nightmares about the beatings, vigilance, that sort of thing and that's pretty much washed out."

Counsel called Faye Kerfoot, Storey's adopted aunt, who testified that when Storey was little, she saw "stripes, you know like welt marks on his back and on his little butt." Counsel called Sheila Eubanks, Storey's cousin, who also testified of seeing Storey whipped abusively as a child. Then she testified: "I love him with all my heart. I mean he has been there through, you know, when I have talked to him about what has happened to me in the past whatever, you know, he has been real supportive and he has always been there." Next, counsel called Jimmy Dees, Storey's uncle, who testified about Storey's good disposition. "Well, at four years old he was like any kid, he was a cheery person. He loved animals." Regarding Storey's life, he stated, "I feel that he has been a loving and caring person and I love him."

Counsel called Sharon Stacey, Storey's cousin, who testified that she watched Storey's stepfather force Storey, as a child, to box his brother until they were both bleeding and crying. She then testified that "Tim was a good kid. He was . . . when he was born, I think he cried for the first six months he lived. I thought he was never going to stop crying. . . . After that he was fat and he was rolly polly and he was, he was just—he was a loving baby." "Whenever he had toys, it didn't matter, he would have a brand new toy and the first little kid that came over to play with him he would just give it to him just because they wanted it." Finally, counsel called Carol Storey, Storey's sister-in-law, and Keith Storey, Storey's brother, to confirm the abuse testimony. These witnesses introduced many other instances of abuse that occurred while Storey was a child and corroborated one another's stories.

## C. Points relied on

Storey alleges 13 instances of counsel ineffectiveness in this appeal summarized as follows: 1) counsel failed to impeach Storey's ex-wife; 2) counsel failed to call the judge and bailiff to testify in a special hearing held to investigate jury misconduct; 3) rule 29.15 counsel failed to establish jury misconduct or persuade the motion court to recall the jury during the motion hearing; 4) counsel failed to object to victim impact and other evidence admitted at trial or preserve the issue for appeal; 5) counsel failed to present evidence through additional witnesses; 6) counsel failed to find impeaching evidence or obtain independent testing of unidentified hairs found on Ms. Frey's body; 7) counsel failed to present additional mitigating evidence through several experts; 8) prosecutorial misconduct; 9) direct appeal counsel was ineffective for not raising several allegations of trial court error; 10) counsel

failed to object to several points of witness testimony; 11) counsel failed to object to two of the prosecutor's arguments; 12) counsel failed to object to the prosecutor's description of the burden of proof; and 13) counsel failed to object to confusing jury penalty instructions.

### III. Legal standard

 This Court's review of the motion court's denial of post-conviction relief is limited to a determination of whether "the motion court clearly erred in making its findings of fact and conclusions of law." *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000), *cert. denied*, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000). A judgment is clearly erroneous when, in light of the entire record, "the court is left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). The motion court's findings are presumed correct. *Black v. State*, 151 S.W.3d 49, 54 (Mo. banc 2004).

 In order to receive post-conviction relief,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

> To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of reasonableness. To establish prejudice he must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). "To prove ineffectiveness with regard to death penalty sentencing, [the defendant] must show that, but for his counsels' ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted." *Rousan v. State*, 48 S.W.3d 576, 582 (Mo. banc 2001).

 "A strong presumption exists that trial counsel was effective and an appellant bears a heavy burden of overcoming that presumption by a preponderance of the evidence." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996) (citations omitted). There is also "a presumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994). "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Tokar*, 918 S.W.2d at 761 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052). "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices." *Middleton v. State*, 103 S.W.3d 726, 736 (Mo. banc 2003).

 On review of a denial of post-conviction relief, the facts are interpreted "in the light most favorable to the verdict." *Tokar*, 918 S.W.2d at 761. "The question is whether, when all the mitigation evi-

dence is added together, is there a reasonable probability that the outcome would have been different?" *Hutchison v. State*, 150 S.W.3d 292, 306 (Mo. banc 2004).

## IV. Rule 84.04

 Rule 84.04 states the requirements for Storey's brief. Points relied on are critical and must be stated as specified in Rule 84.04(d). The specific requirements for points relied on for review of a trial court decision are set out in subdivision (d)(1). That provision requires each point to "(A) identify the trial court ruling or action that the appellant challenges; (B) state concisely the legal reasons for the appellant's claim of reversible error; and (C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1). "A point relied on which does not state 'wherein and why' the trial court erred does not comply with Rule 84.04(d) and preserves nothing for appellate review." *Avis Rent–A–Car Sys., Inc., v. Howard*, 133 S.W.3d 122, 123 (Mo.App. 2004); *see Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978). "A point relied on written contrary to the mandatory requirements of Rule 84.04(d), which cannot be comprehended without resorting to other portions of the brief, preserves nothing for appellate review." *State v. Dodd*, 10 S.W.3d 546, 556 (Mo.App.1999).

Many of Storey's points relied on are difficult to comprehend. The rambling and shotgun style of Storey's brief has required the Court to spend many hundreds of hours to determine the fair substance of his claims, research the record, and resolve those claims. Any issue or point not addressed was not preserved for review.

## V.

Storey's first point relied on states:

The motion court clearly erred denying claims counsel was ineffective for failing to impeach Tim's ex-wife Kim's abuse allegations that included sexually assaultive behavior, like that Ms. Frey allegedly suffered, by using Kim's love letters and birthday card sent to Tim while he was incarcerated awaiting the original 1991 trial, failing to offer Sheriff Brogden's testimony to establish the abuse never happened, and failing to call Kim's other ex-husband, Andy Posey, to testify she fabricated abuse accusations against Andy and that counsel should have objected to Kim's testimony she could no longer say words sexual in nature because she had become an upstanding Christian. . . .

Kim was unavailable for the third trial. Her testimony from the second trial was introduced at the third trial. Her testimony, from the second trial, was that Storey was violent during their marriage, that he attacked her while she was pregnant, raped her, put a gun to their daughter's head, stabbed a tree while threatening to kill Kim's father, and finally that he cut her with a knife while they were having sex.

Kim admitted on cross-examination that she never reported any of this abuse. She then claimed that she could not repeat what she told people about these incidents because it was "something I can't say 'cause I'm a Christian." Counsel for Storey, in the second trial, pointed out on cross-examination that Kim had drastically changed her account of several of these incidents from prior testimony. Counsel then pointed out to the jury that Kim had lied under oath a year before trial. Kim responded that she had been on drugs at the time. She also admitted to having smashed a flashlight over Storey's head, but did not consider that to be violent. As impeachment in the second trial, counsel

attempted to admit love letters that Kim wrote to Storey while Storey was in prison. The jury in the second trial, and in the third trial through the transcript, heard about the letters, but the content of the letters was excluded during the second trial on grounds of hearsay, relevancy, and sexual explicitness.

### A. The love letters

■ Storey claims that trial counsel was ineffective by failing to introduce, as impeachment evidence, a birthday card and two love letters that Kim wrote to Storey while he was in prison. Although the content of the letters was excluded during the second trial as hearsay, collateral, and sexually explicit, the fact that Kim sent the letters was discussed before the jury. Storey's counsel testified that the failure to offer these letters into evidence, at the third trial, was an oversight. Counsel also thought that the trial court probably would have excluded the letters from the third trial as had been done in the second trial. The motion court held: "Trial counsel used her letters in the 1991 trial, with no success. It is not reasonable to believe the failure to read these letters was prejudicial and would have changed the outcome."

The jury heard Kim's testimony when the transcript was read during the third trial. They knew that she had lied under oath before and continued to change her allegations. The jury knew that Kim wrote love letters to Storey while he was in prison and after the alleged abuse. That was a reasonable item for the jury to consider in evaluating Kim's testimony. Would she send him love letters if he truly treated her so badly? The probative content of the letters beyond this, however,

was minimal.[1] The exclusion of the letters did not prejudice Storey because the letters simply showed how Kim expressed her sexual desire and love for Storey. The content of the letters would not have mitigated Storey's offense. Moreover, the value of the testimony would have been devalued by the sexual content included in the letters had they been admitted. It was not error for counsel not to try and introduce the letters. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel tried to introduce the card and letters they would have been admitted, or even had they been admitted, "the result of the proceeding would have been different." *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted).

### B. Sheriff Brogden's deposition

■ Storey claims that counsel was ineffective for not introducing Sheriff Brogden's deposition at the 1999 sentencing trial to impeach Kim. Sheriff Brogden's deposition was taken by telephone during the trial because the sheriff's father was critically ill. He knew Storey, Kim, and Kim's father. He testified that he did not regard Storey as violent or having a significant criminal record and that Kim's father had interfered with Kim's marriage to Storey.

The State successfully objected to portions of his deposition as hearsay and irrelevant. The trial court indicated that it would exclude Sheriff Brogden's testimony about Storey's insignificant criminal record and marriage, which in counsel's words, were "some of the best portions of the deposition...." Storey's attorneys disagreed about whether the deposition, with-

---

1. The defense wanted the quotes from the letters that indicate: "I love you so much;" "Smile I love you;" and "I want you to know that I will always love you for as long as I live." However, the letters also include sexual language that could have alienated the jury.

out the excluded portions, should be introduced because of the risk of bringing in evidence of a possible motorcycle theft by Storey. Both of Storey's attorneys acknowledge that it may have been beneficial to have had a police officer testify on Storey's behalf even if he had little that could be admitted. One counsel described the disagreement as "a philosophical disagreement about the value of [the deposition]." The head of the public defender's capital litigation division reviewed the decision and opined that the deposition should not be introduced because of its damaging testimony and limited helpfulness. Counsel followed this advice. Because counsel's decision not to admit Sheriff Brogden's deposition was trial strategy, it "is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994).

### C. Evidence of fabricated testimony

Storey claims that counsel should have impeached Kim by presenting the testimony of Kim's ex-husband, Andy Posey. Mr. Posey would have testified that Kim made false claims of violence against him while they were married. He also would have testified that she exaggerates, that she slapped him once, and that she falsely accused him of violence while they were married. Trial counsel believed this testimony to be collateral and not very believable. Because counsel's decision not to present testimony from Mr. Posey was trial strategy, it "is not a ground for ineffective assistance of counsel." *Chambers*, 891 S.W.2d at 109.

### D. Kim as a Christian

Storey claims that Counsel should have objected to Kim's testimony that she was a Christian. Kim's testimony indicated that she could no longer say words of a sexual nature because she had become a

Christian. Counsel did not object because she did not consider Kim's testimony to be credible and thought that this statement would actually diminish her believability by itself. Because counsel's decision not to object to Kim's testimony was trial strategy, it "is not a ground for ineffective assistance of counsel." *Chambers*, 891 S.W.2d at 109.

### E. Counsel was not ineffective regarding any of the allegations contained in subsections (A) to (D) of this point relied on.

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not impeaching Kim with any of this testimony set out in subpoints (C) and (D). *Williams v. Taylor*, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). As to subpoints (A), (B), (C), and (D), Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. "Trial strategy is not a ground for ineffective assistance of counsel." *Chambers*, 891 S.W.2d at 109. "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices." *Middleton v. State*, 103 S.W.3d 726, 736 (Mo. banc 2003).

Storey has not shown prejudice because he has not shown a reasonable probability that had counsel made and preserved all of these objections, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

### VI.

Storey's second point relied on states:

The motion court clearly erred overruling Tim was denied his rights to due process, freedom from cruel and unusual punishment, a fair trial, a fair and impartial jury, and effective assistance of counsel, U.S. Const. Amends. VI, VIII, and XIV, when counsel failed to call Judge Cundiff at the juror misconduct hearing before Judge Schneider to testify after he told the jurors Tim was previously death sentenced a juror stated "I knew that" and failed to call Bailiff Paulson to testify he saw a juror nodding affirmatively in response to [Judge] Cundiff because their testimony, viewed together, established jury misconduct. Reasonably competent counsel would have called [Judge] Cundiff because he had disclosed what was said and would have subpoenaed and called Paulson to confirm it. Tim was prejudiced because both together required a new trial.

Alternatively, the motion court clearly erred overruling Tim was denied a fair trial, a fair and impartial jury, due process, and freedom from cruel and unusual punishment, U.S. Const. Amends. VI, VIII, and XIV, when the juror indicated what he already knew and Cundiff failed to immediately investigate that knowledge and/or disclose to counsel what happened so counsel could immediately investigate, entered orders prohibiting investigation, and prevented a hearing for two months because Tim was improperly denied the opportunity to establish jury misconduct.

The facts relating to this point are as follows. Directly after sentencing, on September 17, 1999, Judge Cundiff spoke with the jurors in the jury room. Some jurors were crying. In an effort to console the jurors about their verdict, Judge Cundiff told them the final decision was his. He also told them that this was the third death verdict. Judge Cundiff did not have his hearing aides in at the time, but said

that while everyone was talking in the jury room, he heard a male voice say: "I knew that." He said he did not know if the statement was made in response to him or to another juror. Bailiff Paulson did not hear the statement, but indicated that he saw a man affirmatively shake his head.

Judge Cundiff scheduled a meeting with counsel for both parties on September 29, 1999. At that meeting, Judge Cundiff told them what he had heard. Storey's counsel filed a motion for a hearing to question the jury. On October 27th, Judge Cundiff denied the motion. Then on November 17th, Judge Cundiff changed his mind and allowed for the special hearing. Judge Schneider conducted the hearing on November 22nd, specific only to the inquiry of whether the jury knew of the prior sentences.

At the special hearing, each juror was asked four questions. First, "Did you serve as a juror during the month of September, 1999, in the case of State of Missouri versus Walter Storey?" Second, "Did you know, before you were sworn in as a juror that the defendant had previously been given the death penalty?" Third, "Did you read any article or see or hear any program during the trial or during deliberation telling you the defendant had previously been sentenced to death?" Finally, "Did any person, other than another juror, tell you during trial or deliberations that the defendant had previously received the death sentence?" Each juror answered the first question affirmatively and the remaining three questions negatively.

At the hearing, Judge Schneider concluded that no jury misconduct had occurred. The 29.15 motion court held: "[N]o evidence of such [jury] misconduct was found. Nor were movant's attorneys ineffective in addressing this issue. Judge Cundiff made it clear [in a later deposition]

that he had no way of knowing or assuming the comment the juror made was in response to him telling the jurors about movant's past trials."

The "well-founded and long-established rule" governing impeachment of a verdict provides:

> [T]he affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury. Alternate jurors are likewise precluded from testifying in a manner that impeaches a verdict.

*Wingate by Carlisle v. Lester E. Cox Med. Ctr.*, 853 S.W.2d 912, 916 (Mo. banc 1993) (citations omitted). Although "[t]he rule extends to juror conduct either inside or outside the jury room," *id.*, a limited exception exists. "[I]t is permissible to elicit testimony about juror misconduct that occurred outside the jury room, such as the gathering of extrinsic evidence...." *Travis v. Stone*, 66 S.W.3d 1, 4 (Mo. banc 2002). In such cases, "[j]uror misconduct during deliberations creates a rebuttable presumption of prejudice, which can be overcome with evidence." *State v. Chambers*, 891 S.W.2d 93, 101 (Mo. banc 1994). However, "[t]he burden does not shift until misconduct is established." *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997).

The questions asked of the jurors were carefully constructed to balance the need to make sure that no juror had gained extrinsic information with the rule prohibiting "testimony of a juror ... for the purpose of impeaching the verdict of a jury." *Wingate*, 853 S.W.2d at 916. No juror misconduct was revealed at the special hearing. Judge Schneider already knew that Judge Cundiff had heard the statement and that the bailiff had not heard it. There was no reason to call the judge and bailiff at the special hearing.

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not calling the judge and the bailiff. *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption ... that trial counsel was effective...." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had the judge and the bailiff testified, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495. Storey has not established the existence of any additional evidence that would have been admissible and the absence, of which, might have been prejudicial.

Storey's alternative argument, that he was prejudiced by the delay of the special hearing, cannot be construed as resulting from the ineffectiveness of counsel. Moreover, no prejudice to Storey has been shown for the same reasons explained above.

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard*, 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd*, 10 S.W.3d 546, 556 (Mo.App.1999).

## VII.

Storey's third point relied on states:

The motion court clearly erred prohibiting 29.15 counsel from calling jurors to testify at depositions and at the 29.15 hearing because those actions denied Tim his rights to due process, a full and fair hearing, to be free from cruel and unusual punishment, and to prove ineffective assistance of counsel, U.S. Const. Amends. VI, VIII, and XIV, in that to prove his claims a juror knew that he was previously death sentenced and counsel was ineffective in establishing that matter it was necessary to obtain the jurors' testimony.

This point does not raise an issue of ineffective assistance of counsel, but of the admission of evidence at the 29.15 hearing. Storey complains in this point that at the post-conviction hearing, the motion court prohibited Storey's counsel from recalling or deposing all of the jurors regarding whether they knew about Storey's prior sentences and convictions before they rendered the death verdict in 1999.

The point fails because the question of jury misconduct was settled, as discussed in the previous section, when the jurors were called in after trial and specifically questioned in 1999 at the special hearing. The questions asked and answered of the jury were carefully constructed to elicit the relevant and admissible evidence necessary to determine if jury misconduct had occurred pursuant to Missouri law. Storey has not established that any further questioning would be admissible or lead to admissible evidence.

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard,* 133 S.W.3d 122, 123 (Mo.App.2004); *see*

*Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App.1999).

## VIII.

Storey's fourth point relied on is divided into seven claims. Storey alleges:

The motion court clearly erred denying claims counsel was ineffective for failing to properly object to and preserve the following: A) Victim impact evidence was not admissible because when this offense occurred *Booth* and Missouri law prohibited it; B) Ms. Frey's mother's testimony "the only way" she gets to "see" her daughter is at the cemetery which appealed to passion and prejudice; C) Witnesses Marshall and Stepson expressing opinions the killing was highly aggravated such that the depravity aggravator existed; D) Respondent's victim impact from Gladys and Timothy Frey and Robert and Trinje Reidelberger exceeded *Payne's* bounds, was hearsay, opinion and speculation; E) The religious impact Ms. Frey's death caused because that is contrary to *Debler* and *Whitfield;* F) Admission of Ms. Frey's three year old picture which appealed to passion and prejudice; and G) Respondent's argument the entire community was a victim which expanded the universe of victims beyond *Payne* . . . .

### A. Ex post facto admission of victim impact evidence

Storey's first claim is that his trial counsel was ineffective by not objecting that "[v]ictim impact evidence was not admissible because when this offense occurred *Booth* and Missouri law prohibited it." When Storey killed Ms. Frey in 1990, the

Missouri rules of evidence did not allow for victim impact evidence. In 1993, the Missouri legislature amended section 565.030 to allow it. Counsel testified that she "should have made that objection," that the admission of victim impact evidence violated the ex post facto clause. The motion court held that "[v]ictim impact evidence is admissible and this was proper victim impact evidence. Trial counsel was not ineffective in failing to raise this objection without a sound legal basis for doing so."

■ "The ex post facto clause is aimed at laws that are retroactive and that either alter the definition of crime or increase the punishment for criminal acts already committed." *State ex rel. Cavallaro v. Groose*, 908 S.W.2d 133, 136 (Mo. banc 1995). A "mere disadvantage to an offender is not the standard for judging the ex post facto effect of the law." *Id.* "[N]o ex post facto violation occurs if the change in the law is merely procedural and does not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt." *Miller v. Florida*, 482 U.S. 423, 433, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (internal quotations omitted).

■ In this case, there was no change in the requirements, burden of proof, or penalty for first-degree murder by allowing victim impact evidence. Storey's "mere disadvantage" of having more evidence admitted in his third trial is insufficient to show an ex post facto violation. *Cavallaro*, 908 S.W.2d at 136. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *State v. Six*, 805 S.W.2d 159, 167 (Mo. banc 1991).

**B. Ms. Frey's mother's testimony that she can only see her daughter in the cemetery**

■ Storey argues that trial counsel was ineffective for failing to object to "Ms.

Frey's mother's testimony 'the only way' she gets to 'see' her daughter is at the cemetery which appealed to passion and prejudice." The 29.15 motion court held that Storey "presented no evidence that this questioning was prejudicial or so clearly improper that counsel should have objected."

In Storey's prior appeal, this Court held that victim impact evidence "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question. . . . As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *State v. Storey*, 40 S.W.3d 898, 908 (Mo. banc 2001) (internal quotations omitted).

■ It is very understandable that Storey's counsel did not want to interrupt the victim's mother while she was testifying. By not objecting, counsel avoided the possibility of alienating the jury. Further, this victim impact evidence was properly admissible, and Storey's proposed objection lacks merit. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

**C. Opinion testimony that the killing was highly aggravated**

■ Storey claims that trial counsel failed to object to "[w]itnesses Marshall and Stepson expressing opinions the killing was highly aggravated such that the depravity aggravator existed." Ms. Marshall, a neighbor tried to explain why she did not comprehend the nature of the noise she heard from Ms. Frey's apartment. Ms. Stepson, a fellow teacher of Ms. Frey, tried to describe the profound impact of

this murder. These witnesses used the words "heinous," "incomprehensible," and "brutality." Ms. Frey's neighbor, Ms. Marshall, testified:

Q. Did you call the police? Was that the last thing you heard, by the way?

A. Yes.

Q. What—did you call the police after you heard this at all?

A. I had started to dial 911. I dialed 91, put the phone down because it got quiet.

Q. Why didn't you call the police?

A. May I answer in my own words?

Q. Please?

A. Never in my life in my frame of reference would I have ever believed anything so heinous as that—

MR. KENYON: I'm sorry, I'm going to object, this is nonresponsive.

Later, Ms. Stepson, a fellow special education teacher of Ms. Frey's, testified:

Q. Thank you. Miss Stepson, in particular, what impact has Jill Frey's murder had on you?

A. Well, I—it was really difficult for me to go back to work because there were memories everywhere I looked of Jill. It was difficult because the children were suffering, the parents were suffering. I had two fairly young children at the time, and really felt overwhelmed by her murder and everything that had occurred.

Q. How did you tell your children about Jill's death?

A. I don't know, I really don't know how I told them. I think we talked about it quite a bit, but it was really almost incomprehensible for children to understand the brutality of something like that.

Q. Did this affect—you said it has affected your work, did it affect your personal life?

A. Yes, very much so.

The motion court denied this claim stating "counsel did object to Ms. Marshall's testimony, but not based on movant's convoluted theory."

These comments were not given as opinion regarding the classification of the crime, but as an attempt by these witnesses to explain their actions and the impact of the crime on their lives. The pictures of the crime scene, which the jury saw, portray an act of brutal violence. Having seen those pictures, the jury knew how horrible this crime was, and there can be no doubt that Storey's sentence had little to do with the words these witnesses used. An objection by counsel to the testimony of these friends and neighbors not only would be meritless, it could make the defense look callous and overly technical before the jury. "Counsel is not deemed ineffective for declining to make a nonmeritorious objection." *Six*, 805 S.W.2d at 167.

### D. Hearsay, opinion, and speculative victim impact testimony

■ Storey claims that trial counsel erred by not objecting that "victim impact from Gladys and Timothy Frey and Robert and Trinje Reidelberger exceeded *Payne's* bounds, was hearsay, opinion and speculation." Robert and Trinje Reidelberger testified of how Ms. Frey had facilitated Robert's learning. Ms. Frey's mother and brother testified that Ms. Frey's murder contributed to her father's death. Storey complains that the murder occurred 10 years before and could not be the actual cause of Mr. Frey's death.

■ "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence

it deems helpful to the jury in assessing punishment." *Storey*, 40 S.W.3d at 908 (internal citations omitted). The Freys did not offer this testimony as a medical opinion of causation, but only as their perception of the continuing impact of this crime on their family during three retrials, three appeals, and a post-conviction hearing.

Storey presented 10 mitigating witnesses, including seven close friends or family who testified all about Storey's life from the time he was a few months old up to the time of his imprisonment. Each told of horrible abuses suffered by Storey growing up in a terrible family. Storey was permitted to present mitigating evidence to help the jury assess punishment. The evidence Ms. Frey's friends and family presented "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

### E. Evidence of the religious impact of Ms. Frey's death.

Storey claims that trial counsel should have objected to testimony about "[t]he religious impact Ms. Frey's death caused because that is contrary to *Debler* and *Whitfield*." [2] Jody Harrison, a close friend of Ms. Frey, testified:

Q. Okay. What would you say the loss of one of your closest friends and the manner of her death, what impact has that had on you personally, emotionally, socially, spiritually?

A. Emotionally, I was very distraught. I'm one that does believe that you must move on and as I know Jill would want us to do.

Spiritually, Jill's death brought me closer to God. As you will probably hear later when I read what I wrote for her eulogy, it is not my style to volunteer to say that I will write and talk in front of a group of people and do a eulogy. I knew that that came from God.

Jill has definitely been a spiritual being for me and has helped me down that avenue definitely.

Trinje Reidelberger, another friend of Ms. Frey, testified as follows:

Q. Did you write a poem for her after her passing that reflected in part, her passing, the impact of her passing on you and those you knew?

A. Yes, I did. That night I couldn't sleep and I kept praying to God to help Jill's family get through this and at midnight all of these words started coming to me and I wrote them down. And this is the poem that is on her tombstone now.

Q. . . . . Is that the original of the poem that you wrote?

A. Yes it is.

Q. Does that reflect, in fact, the impact that her passing had on you and others and how you dealt with it?

A. Yes, it is.

. . . .

Q. . . . . Would you read that, please?

A.

---

**2.** In *State v. Whitfield*, this Court said that while these type "statements are troubling, they are not plain error." 837 S.W.2d 503, 513 (Mo. banc 1992). That was a direct appeal.

### Our Special Jill

You hear your children talk and play,

and say what they will become someday.

Your daughter was one of very few,

she knew just what she wanted to do.

All her friends and co-workers can say,

she put her heart and soul in each day.

She worked so hard for God's special child,

some were hard and others were mild.

Everyday was a challenge to her you see,

but she had a goal for you and me.

There was never a hill you couldn't climb,

because Jill always gave you and your child her time.

She had more love than you've ever seen,

and all of you know how much that means.

Even though her time was short with us,

each day we'll remember her special plus.

For every child that was touched or blessed by Miss Frey,

will always have a sparkle in their eye.

That eagerness to learn will always stay,

God bless her and guide her on her way.

We all love her and she'll be deeply missed.

May God guide you all.

Trinje Reidelberger

The motion court denied this claim stating: "This claim is without merit. The testimony did not overtly suggest that the victim was spiritual or religious and trial counsel was not ineffective in failing to make these objections."

▬ In *State v. Debler*, this Court stated: "The decision between life and death should not turn on the most compelling Scriptural parallel or the best historical analogy.... [B]oth sides should avoid excessive Biblical and historical references." 856 S.W.2d 641, 656 (Mo. banc 1993). While an objection is proper to any attempt to compel a jury to impose a death sentence based on religion, *id.*, there is no general prohibition to religious references in a sentencing.

▬ These comments were not made in reference to reasons why Storey should be sentenced to death. Ms. Frey's friends and family felt that Ms. Frey's death brought them closer to God. This is victim impact evidence, and counsel is justified in not further highlighting the statement by making a meritless objection. These witnesses were entitled to tell the jury about the impact of Storey's crime, and the jury was entitled to hear about it. Storey has not shown that these statements were an "attempt to compel a jury to impose a death sentence."[3] *Id.* Nor has he shown that the references were excessive. *Id.* "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

---

**3.** Storey does not complain that his own counsel did try to compel a life sentence by alluding to Jesus' parable of sowing seeds and argument that "[w]e have been brought here to decide if [Storey] will die in God's time or in your time."

### F. Admission of Ms. Frey's pictures

■ Storey claims ineffectiveness of counsel in failing to object to "[a]dmission of Ms. Frey's three year old picture which appealed to passion and prejudice." He claims that the picture was improper victim impact evidence.

"As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *Storey*, 40 S.W.3d at 908 (internal quotations omitted). "The photographs of Frey . . . serve to illustrate Frey's value to the community and the impact of her death upon her friends and co-workers. In other words, the exhibits help the jury to see the victim as something other than a 'faceless stranger.'" *Id.* at 909. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

### G. Prosecutor's argument that the entire community was a victim

■ Storey claims that counsel was ineffective by failing to object to the prosecutor's "argument the entire community was a victim which expanded the universe of victims beyond *Payne*." The prosecutor said, regarding Ms. Frey's death, "Like throwing a rock into a pond, there are ripples that go in all directions and those ripples in this case from that murder have washed all over this family and this community like a tidal wave." Counsel testified: "I think it's a close call. I see . . . at least the argument, that he expands the victims in this case. I don't know that that ever would have resulted in any appellate relief. We probably should have posed an objection anyway." The motion court denied the claim stating that counsel "testified that, on reflection, whether she should have objected was a close call. She did not believe preserving the objection would have resulted in appellate relief."

Counsel contemplated making this objection, but decided against it. While the prosecutor's statement is flowery, an objection to it would have great propensity to upset the jury because it would be saying that, no, this murder did not wash all over the family or the community. It is easy to see why counsel reasonably decided not to make this objection and risk alienating the jury. "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994).

### H. Counsel was not ineffective regarding any of the allegations contained in subsections (A) to (G) of this point relied on.

For each of the claims made in this point, counsel cannot be "deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167. Storey has not shown, for any of the claims in this point relied on, "that counsel's representation fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. Storey has not shown prejudice because he has not shown a reasonable probability that even had counsel done every single thing complained of in this point relied on, that "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

The rest of the language in this point relied on "preserves nothing for appellate

review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard,* 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App.1999).

## IX.

Storey's fifth point claims that counsel was ineffective for failing to present the following evidence: A) from "non-family witnesses, Hughes, Watsons, Sumner, Whitley, Chester, Hansen, Raver, Marshall, Pafford, McGees, Wetherington, and Kinchen;" B) from "family witnesses, Susie Storey, Johnny Dees, and Patricia Dees Heath;" C) complete evidence from "family witnesses Pat Basler and Sharon Stacey;" and D) "all employment records from Chaparral Boat and Vocational Rehabilitation. . . . "

### A. Additional non-family evidence

■ Storey claims that counsel was ineffective by not presenting the evidence from "non-family witnesses, Hughes, Watsons, Sumner, Whitley, Chester, Hansen, Raver, Marshall, Pafford, McGees, Wetherington, and Kinchen[.]" Storey claims that this evidence would have been inherently more credible than the family evidence presented by counsel.

The Watson and Hughes families signed affidavits regarding the abuse that Storey suffered as a child and the good manner in which he treated his wife and daughter later in life. Ms. Sumner, another friend of Storey, was unavailable, but offered to have her deposition taken for trial. Ms. Sumner would have testified that Storey was respectful and non-violent while grow-

ing up. She would have also testified that she did not suspect that Storey abused his wife.

Mr. Whitley's testimony would have been offered to refute evidence that Storey and his brother were raised identically. Mr. Whitley's home was drug and alcohol free. Storey's brother lived with Mr. Whitley on and off after turning 10 years old, but not consistently until high school. The vast majority of the abuse evidence presented to the jury occurred to both Storey and his brother, and it occurred before Storey's brother began spending time with Mr. Whitley. Trial counsel testified that the mitigation strategy was to show that the abuse Storey received as a child resulted in irreversible damage to Storey. She also testified that showing evidence that his brother came out well-adjusted because of a good influence later in life would have undercut the trial strategy.

Mr. Chester, Mr. Hansen, Ms. Raver, Mr. Marshall, and Mr. Pafford all taught or coached Storey while he was growing up. They would have testified that he was a well-behaved child and that his academic difficulties were due to his dysfunctional family. Counsel testified that these witnesses were not called because their testimony was not compelling. Counsel also felt that this evidence of good behavior and average grades at school "might have been perceived as inconsistent with some of the evidence we were offering about his home life." "I am just not certain the jurors place a lot of weight on whether an adult defendant was a good student when he was a child or behaved well as a child." Counsel testified that these teachers' contact with Storey "would have been relatively limited," and "it might not have been an area that the jury would place much weight on . . . as compared to his adult behavior."

Mr. McGee, Mr. Wetherington, and Mr. Kinchen were former employers. They would have testified that Storey was a hard worker with a good attitude. When asked about these witnesses, counsel indicated that she now would have considered calling them.

Counsel testified that the overall strategy was to use family members as witnesses who knew Storey very well. The affidavits and depositions that Storey complains about reiterate the same stories already presented by witnesses who testified at trial. Storey has not shown that any of these other witnesses, who had limited contact with him, "would have presented a viable defense" to the sickening photographs and evidence of Storey's crime. *State v. Harris,* 870 S.W.2d 798, 817 (Mo. banc 1994). Counsel was not "ineffective for not putting on cumulative evidence" from these other witnesses. *Skillicorn v. State,* 22 S.W.3d 678, 683 (Mo. banc 2000), *cert. denied,* 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000).

### B. Additional family witnesses

■ Storey complains that counsel was ineffective for not utilizing evidence from "family witnesses, Susie Storey, Johnny Dees, and Patricia Dees Heath." Susie Storey would have testified of the bruises she saw on Storey as a baby and that she had threatened Storey's father about it. She also would have testified that Storey was a sweet boy. Johnny Dees would have testified of the physical abuse inflicted on Storey by his father and that Storey was a happy person who did not get into fights. Patricia Dees Heath is Johnny Dees' daughter, and she would have testified that Storey was polite, respectful, and did not cause trouble.

Counsel testified that there was no good reason why Johnny Dees' deposition was not taken or Susie Storey was not called to testify. Counsel testified regarding Patricia Dees Heath, "I think she fit in with our strategy, the only question I would have is whether what she had to say might have become cumulative in light of the other information we had presented." The motion court held that "Mr. Dees was contacted, and the attorneys were familiar with his potential testimony.... The Court does not find trial counsel's claim that she 'should have' called Mr. Dees at trial persuasive. His testimony would not have been persuasive nor helpful."

Counsel introduced this type of mitigation evidence through other family members. Storey has not shown that additional testimony from these witnesses, "would have presented a viable defense" to the sickening photographs and evidence of Storey's crime. *Harris,* 870 S.W.2d at 817.

### C. Complete evidence from family witnesses

Storey claims that counsel should have presented the complete evidence of "family witnesses Pat Basler and Sharon Stacey." Pat Basler would have testified that Storey had suffered a neck injury, which impeded his ability to find work. Sharon Stacey would have testified that Storey's father touched her in an inappropriate way, grabbed her throat, kicked her, and threatened to rape her. Counsel felt that an objection would have been sustained if she had attempted to introduce Sharon Stacey's testimony. The motion court held that Storey has not shown that either of these witnesses "would have provided any persuasive or helpful information. The court finds that their testimony would not be credible or persuasive." It further held that "both witnesses testified at the 1999 trial. Neither witness was persuasive with the jury. Movant fails to show that the 'additional facts' would ever be admissible.

The Court finds that the testimony would not be credible or persuasive...."

This additional testimony of Sharon Stacey and Pat Basler is all sideshow. Even had the court allowed the evidence, and had the jury believed it, the evidence is not particularly helpful to Storey. Counsel had already established that Storey claimed a head injury and that his stepfather was abusive. These witnesses would have reiterated the same thing. Counsel was not "ineffective for not putting on cumulative evidence." *Skillicorn*, 22 S.W.3d at 683.

### D. Employment records

 Storey complains that counsel should have presented "all employment records from Chaparral Boat and Vocational Rehabilitation...." There is no argument provided in Storey's brief stating why the rehabilitation records should have been introduced. Counsel felt that the additional employment information would have been cumulative and may have opened the door to drunk driving evidence. The motion court held that the "[r]ecords of movant's employment history would also not be helpful. The Chaparral Boat records would show that movant quit his job on December 23, 1988."

At Chaparral Boats, Storey built boat decks and hulls. The evidence from that job was that he was a hard worker with a good attitude, but that he quit without giving notice. Storey claims that he left because of an injury. The medical records indicate that his own drunk driving caused his injury. As employment mitigation, counsel presented the testimony of Storey's supervisor at the prison library. She testified that he was a good worker who did not cause trouble. The records from Chaparral indicate the same thing. Counsel was not "ineffective for not putting on

cumulative evidence." *Skillicorn*, 22 S.W.3d at 683.

### E. Counsel was not ineffective regarding any of the allegations contained in subsections (A) to (D) of this point relied on.

The motion court denied this entire point relied on and held that Storey had not shown that any of these witnesses "would have provided any persuasive or helpful information. The court finds that their testimony would not be credible or persuasive. The court further [finds] that the trial counsel made a strategic decision to call certain witnesses to obtain certain evidence they hoped would be mitigating." Regarding counsel's overall trial preparation, the motion court held that "[t]rial counsel was very thorough in seeking witnesses, preparing for trial, and developing a trial strategy."

The trial transcript, as presented, contains nearly 300 pages of mitigating testimony from different witnesses about Storey's childhood and family. His mother testified of the extreme and recurring abuse Storey received as a child; Dr. Vandenberg testified of his personality disorders due to this abuse; his adopted aunt testified of abuse from his step-father as a child; his cousin testified both of the abuse she witnessed while Storey was a child and of his naturally good disposition; his uncle told of his good disposition; another cousin testified of the same abuse and of his great disposition as a child. Both his sister-in-law and brother confirmed the stories of the above witnesses.

Storey has not overcome the "strong presumption ... that trial counsel was effective...." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has failed to show any error at all by counsel let alone "that counsel's representation fell below an objective standard of reasonable-

ness." *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." *Tokar,* 918 S.W.2d at 766. "Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices." *Middleton v. State,* 103 S.W.3d 726, 736 (Mo. banc 2003). Storey has not shown prejudice because he has not shown a reasonable probability that had the jury received this evidence, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard,* 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App.1999).

## X.

Storey's sixth point is particularly difficult to understand. The point attempts to raise a *Brady* claim and an ineffective assistance claim regarding two pubic hairs found on Ms. Frey's body. The relevant part of the one sentence point states:

> The motion court clearly erred finding respondent did not fail to disclose evidence that would have impeached Highway Patrol chemist Smith's 1991 trial hair comparison testimony, in overruling the motion to reopen the judgment to present additional evidence from 1991 trial counsel Hirzy to prove prejudice, and in finding 1999 counsel

was not ineffective for failing to uncover the impeaching information and obtain independent microscopic hair testing to support a motion to recall the guilt mandate and to present this evidence at the retrial to support life because Tim was denied his rights to due process, freedom from cruel and unusual punishment, and effective assistance of counsel, U.S. Const. Amends. VI, VIII, and XIV, in that respondent was required to disclose evidence that impeached Smith and called into question Tim's conviction's reliability, Hirzy would establish why the non-disclosures were prejudicial, and reasonably competent 1999 counsel would have uncovered the Smith impeaching information and had independent microscopic hair testing done to support a motion to recall the mandate. . . .

### A. Brady claim

The first claim in this point alleges a *Brady* violation in Storey's 1991 guilt trial. Storey alleges that the following were not produced: (1) Ms. Smith's report on hair tests from Ms. Frey's boyfriend, Daniel Cruz; (2) a Missouri Highway Patrol document; (3) notes from a meeting Ms. Smith had with the assistant prosecutor, Mr. Groenweghe; (4) an FBI report of additional testing performed on the hairs; and (5) a memo written by Ms. Smith to Mr. Ahsens, another prosecutor in an unrelated case. The motion court held: "The movant asserts that the State withheld 'Brady' material, although the amended motion fails to specify any violation. Thus the claim is not cognizable."

■■■ In *Brady v. Maryland,* the Supreme Court held: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "Exculpatory evidence is evidence that is favorable to an accused.... Favorable evidence is considered material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *State v. Phillips*, 940 S.W.2d 512, 516–517 (Mo. banc 1997) (quoting *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 517.

### 1. Ms. Smith's report on hair tests from Mr. Cruz

Ms. Smith ruled out Ms. Frey's boyfriend, Mr. Cruz, as a suspect by comparing his hair to hair found on Ms. Frey's body. The report, dated July 26, 1990, states: "The foreign caucasian pubic hairs found on the victim's hand (# 2H) and in the victim's pubic hair combings (# 2E) were not consistent with the pubic hair characteristics of 'Daniel Cruz' (# 50)." The acknowledgment of receipt of file contents signed by Storey's 1991 defense counsel, Ms. Hirzy, indicates that this report was produced and turned over to Storey's counsel by the State on November 12, 1990. This is a frivolous claim.

### 2. The Missouri Highway Patrol report

█ The Missouri Highway Patrol issued a report on March 21, 1990, regarding the hair analysis done by Ms. Smith. The report states: "A pubic hair in the victim's pubic hair combings (# 2) and a pubic hair found in the victim's hand (# 2) were found to be foreign to the victim's pubic hair standards (# 2). These foreign hairs were compared to the suspect's pubic

hair standard (# 49) and were found to be different." This report was also disclosed to Storey's trial counsel, as indicated on the acknowledgment sheet dated November 12, 1990.

Storey claims that another related document was not produced by the State, which is dated July 24, 1990, and entitled "Laboratory Analysis Request." That request indicates that three sexual assault kits were submitted from Mr. Cruz, Storey, and Ms. Frey. The "Brief Summary of Incident" section of the request states, in its entirety: "MSHP lab analysis of hairs found on victim and that of suspect's hair samples do not provide positive proof linking suspect to victim. Sexual assault kit with hair samples from victim's boyfriend being submitted for comparison with hairs found on victim." The Laboratory Analysis Request indicates the same information as the report disclosed by the State. This is not exculpatory evidence. Storey did not attempt to show, during the 29.15 hearing, how he was prejudiced by not having received this document.

### 3. Ms. Smith's notes from meeting with Mr. Groenweghe

█ Ms. Smith met with the prosecutor, Mr. Groenweghe, to discuss her hair comparison report prior to Storey's 1991 trial. Notes from their meeting on February 6, 1991, indicate, in relevant part:

> [T]he fact is that there are two differences, however my opinion is that the 2Q [pubic hair] could have come from the suspect. .... The [prosecuting attorney] thinks his case will collapse on the [pubic hair] report since he cannot establish sexual contact otherwise.... My original report of comparisons between the suspect's [pubic hair] and [pubic hair] found in the victim's [pubic hair] combings and on the [victims] hand stated that I found "differences." This

report was written using those terms because I am aware that my supervisor does not approve of saying "similarities and differences." Although to have stated my report this way would have more accurately reflected my observation. The two differences I found in this comparison (Length & Medulla) may not be enough to override the many similarities that I found. Although my report may give the impression that I do not believe the questioned hair came from the suspect, this is not my opinion.

I have since learned from the CHR that the [different] medulla characteristics should not be heavily weighed.

Storey has not shown that he was ever entitled to see these notes. These notes indicate that Mr. Groenweghe was worried that the sexual assault case would collapse without linking the hairs to Storey. Storey, however, was never convicted of sexual assault. Regardless, Storey was not prejudiced by not having received them. The memo, taken as a whole, strengthens the State's 1991 position that Storey could not be eliminated as a suspect. It shows that there were similarities and differences between Storey's hair and the hairs left on Ms. Frey's body. This is not exculpatory evidence.

### 4. The FBI report

 The FBI did an analysis of the hairs found on Ms. Frey's body in April 1991. The FBI report indicates:

Light brown caucasian hairs exhibiting pubic region characteristics were found, one each, on the Q1 and Q2 glass microscope slides. These hairs are, however, finer in diameter than typical pubic hairs and are extremely abraided [sic] and debris laden. Similarities and differences were observed between these hairs and the hairs found in the K3 pubic hair sample from STOREY.

Accordingly, no conclusion could be reached as to whether or not these hairs originated from STOREY.

This is not exculpatory evidence. Storey did not explain to the motion court how he was prejudiced.

### 5. The memo written by Ms. Smith to Mr. Ahsens

This memo is dated December 4, 1995. It is from correspondence between Smith and the prosecuting attorney regarding *State v. Chaney*, 967 S.W.2d 47 (Mo. banc 1998). It states:

After visiting with you last Tuesday it occurred to me that this Winters case has some of the most complicated trace exams that I have ever testified on. There is so much here. I want to help you all I can. The following is a text of mock questions and answers. This is probably very abbreviated, but they cover the main points and you will no doubt expand the questions. I mainly wanted to lead you through the convoluted course of my examinations in hopes I can give you some prior insight.... [T]his will help you predict better just how I will answer certain questions.

I feel confident that your charming ways will inspire a lucid, coherent and utterly convincing testimony out of me. (!!!).

This memo has nothing to do with Storey's trial. It is not *Brady* material. Storey's conviction trial was in 1991. This memo was not even written until 1995. Ms. Smith did not testify in Storey's 1999 penalty trial. Storey's counsel obtained this memo in an unrelated case. Even if the memo had existed in 1991, the duty to disclose impeachment evidence is not so broad.

If all five of these claims, improperly referred to as *Brady* claims, had been

preserved for consideration by the motion court, they still would not amount to a *Brady* violation. All of these claims concern information that was as incriminating as it was exculpatory. All were about subject matters of which Storey was already aware. Furthermore, each item was similar to the initial report provided to him. Storey has made no indication of how he was prejudiced. The evidence Storey complains about does not "undermine confidence in the outcome." *Phillips*, 940 S.W.2d at 517.

### B. Uncovering impeaching information

■ In this same point, Storey also claims that counsel was ineffective for "failing to uncover the impeaching information and obtain independent microscopic hair testing to support a motion to recall the guilt mandate and to present this evidence at the retrial to support life...." The exculpatory hair evidence, which Storey refers to, relates primarily to sexual assault and was only presented at the guilt phase of the trial in 1991; the evidence was not presented at the penalty phase because Storey's counsel successfully excluded all reference to sexual assault during the 1999 penalty trial.

Before addressing this claim directly, it is important to recognize the overriding trial strategy that precluded further investigation into this evidence. Ms. Frey's body was found naked below the waist. However, there was no conclusive evidence of sexual assault. Two pubic hairs were found on Ms. Frey's body, but they could not be conclusively linked to Storey. The hairs also could not eliminate Storey as a suspect. During the 1999 trial, Storey's counsel excluded any argument or evidence that Storey sexually assaulted Ms. Frey. The motion court held that "the record reflects that counsel was effective in obtaining an order excluding the State from arguing sexual assault."

Storey now claims that trial counsel was ineffective for not obtaining additional testing of the pubic hairs. In this 29.15 proceeding, mitochondrial DNA found in the two pubic hairs was compared with Storey's mitochondrial DNA.[4] The new results do not positively identify Storey, but he still cannot be excluded as a suspect based on the hairs because he matches them. The motion court held that this "investigation actually reveals the wisdom and prudence of trial counsel in deciding not to engage in such additional testing.... In this case movant sought DNA testing of the hairs. That DNA testing

4. Although mitochondrial DNA is not a reliable indicator, it is gaining acceptance as an exclusion method. *See United States v. Beverly*, 369 F.3d 516, 531 (6th Cir.2004) (cert. denied 543 U.S. 910, 125 S.Ct. 122, 160 L.Ed.2d 188 (2004)). According to the 6th Circuit's decision:

> Thus, this technique is very useful for minute samples or ancient and degraded samples. Ibid. In addition, mitochondrial DNA can be obtained from some sources that nuclear DNA cannot. For example, mtDNA can be found in shafts of hair, which do not have a nucleus, but do have plenty of mitochondria. Nuclear DNA can only be retrieved from the living root of the hair where the nucleus resides.

> On the other hand, mtDNA is not as precise an identifier as nuclear DNA. In the case of nuclear DNA, half is inherited from the mother and half from the father, and each individual, with the exception of identical twins, almost certainly has a unique profile. MtDNA, by contrast, is inherited only from the mother and thus all maternal relatives will share the same mtDNA profile, unless a mutation has occurred.

> Because it is not possible to achieve the extremely high level of certainty of identity provided by nuclear DNA, mtDNA typing has been said to be a test of exclusion, rather than one of identification.

> ....

found a 'match.' 'Therefore, Walter Timothy Storey is not excluded as the contributor of the two questioned hairs.'" As to Storey's claim, that counsel failed to find impeachment evidence against the hair experts, counsel made a much wiser choice when she eliminated all reference to the evidence and the entire testimony of those experts.

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by eliminating all reference to sexual assault rather than conduct further testing or by impeaching the experts. *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Storey has not overcome the "strong presumption ... that trial counsel was effective...." *Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy" by not further testing this evidence. *Id.* at 766. "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had counsel pursued further testing, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

Regardless of the two hairs and all of the tests done on them, Storey is linked to this murder because he left a bloody handprint in Ms. Frey's room and his blood on a t-shirt. He also confessed to the crime. Trial counsel was effective enough to have all references to sexual assault excluded from the 1999 trial even though Ms. Frey was found naked from the waist down. Storey has not shown that "the result of the proceeding would have been different" had the sexual assault evidence been allowed and impeached at trial or had the

mitochondrial DNA tests been conducted earlier. *Id*

## XI.

■ Storey's seventh point complains that "counsel was ineffective for failing to present mitigating evidence through experts with expertise like Cowan, Vliestra, Straub, Smith, Jolly, Miller, and Pierce and to introduce document [e]xhibits ... supporting their findings...."

### A. Dr. Cowan

Dr. Cowan conducted a neurophysiological exam on Storey and testified in Storey's 1993 post-conviction relief hearing. He would have testified that Storey is brain-damaged. The supporting evidence would include Storey's educational records to show that his performance was declining, evidence of his car accident in 1987, and that his mother drank while she was pregnant with Storey.

At the 29.15 hearing, counsel referred to a memo she prepared after interviewing Dr. Cowan, and testified:

> The problem with his findings were that he found the impairment to be mild.... [T]hat might not be persuasive to a jury.... He found that things were just outside of normal limits.... [H]e said he always testified for the defense and never for the State.... He also indicated that he had no medical records to support the head trauma. I think the reports, oral reports had been made that Tim suffered head trauma. He had no medical documents to support that those were the cause of any impairment that Tim was suffering from. I think the collective reasons that I noted in the memo caused me not to want to call Dr. Cowan.

Counsel also felt that the jury would not care about Storey's grades and educational records. The motion court found, "Review

of his proffered evidence shows that this evidence would not be credible or persuasive. PCR Counsel also told trial counsel that Dr. Cowan was subject to cross-examination because he does so much work for the public defender's office. Dr. Cowan's testimony is speculative at best. . . ."

## B. Dr. Vliestra

Dr. Vliestra is a child development psychologist who would have testified that Storey turned out differently than his brother, Keith, because his brother benefited from a positive role model later in life. The supporting evidence is that Storey was predisposed to alcoholism because his father, unlike Keith's father, was an alcoholic; Storey was abused by his stepfather; Storey moved too often to develop a peer support group; and Keith left him behind and lived with a positive role model.

Counsel felt that Dr. Vliestra's testimony could alienate the jury because the prosecutor would point out that Ms. Frey's entire life had been dedicated to helping this same group of children. The motion court found that Dr. Vliestra's testimony "seems geared only to engender sympathy for movant without providing insight into his background related to [Storey's] criminal behavior."

## C. Dr. Straub

Dr. Straub is a psychologist. He would have testified that Storey's behavior around the time of the crime is consistent with dissociation and posttraumatic stress disorder and that his acts evidence a crime of rage that is inconsistent with conscious action. The evidence Dr. Straub would rely on is that Storey's stepfather was abusive, unpredictable, and explosive; that later abuse caused further unpredictability; and that Storey abused substances to block out feelings and memories. Dr.

Straub testified at the 1993 PCR hearing. In his deposition for this proceeding, Dr. Straub, contradicted the opinion he gave at the 1993 PCR hearing that Storey suffered from Antisocial Personality Disorder.

Counsel could not recall her reasons for not selecting Dr. Straub, but presumed that his testimony "wasn't persuasive or significant enough, and that [she] selected Dr. Vandenberg to talk about the extreme emotional distress." The motion court found that "Dr. Straub's testimony was essentially the same as presented to the jury in 1999 by Dr. Vandenberg, only more verbose and confusing." The motion court also found that Dr. Straub's testimony "was subject to cross-examination because he relied on Jill Miller's unreliable report and did not have any medical records to support his conclusion of brain injury."

## D. Dr. Smith

Dr. Smith is another psychologist specializing in substance abuse. Dr. Smith would have testified that Storey's intoxication exacerbated the effects of his damaged frontal lobes and that he acted under the influence of extreme mental or emotional disturbance. Dr. Smith would opine that Storey could not conform his conduct to the requirements of the law. The facts to have been used in support of this testimony are Storey's predisposition as an abused to become an abuser, that his mother drank while she was pregnant with him, and that his parents were bad role models who sanctioned substance abuse. Dr. Smith's entire testimony was based upon Dr. Cowan's findings, and counsel had decided not to use Dr. Cowan.

The motion court found that "Dr. Smith's involvement in the case was much later that Dr. Vandenberg's and presented no testimony substantially different than Dr. Vandenberg. The testimony is certainly no more persuasive or credible than

Dr. Vandenberg.... Dr. Smith also is subject to credibility problems based on the fact that he always testifies for the public defender's office."

### E. Dr. Jolly

Dr. Jolly is an expert on the effects of alcohol. Dr. Jolly would have testified that alcohol has special effects on people with neuropsychological problems. Along with Dr. Cowan's testimony, Dr. Jolly's testimony would have been that Storey acted under extreme emotional distress exacerbated by alcohol and that he had sustained a closed head injury.

Counsel testified that Storey's PCR counsel told her, in 1999, that "[Dr. Jolly] had done very little court work" and that he "might be vulnerable on cross because he is an administrator at the University of Nebraska, and I think ... others might perceive him as a bureaucrat and not a scientist." She also testified that she thought, "when cross examined by the State that he couldn't put any medical corroboration of this closed head injury."

### F. Ms. Miller

Ms. Miller, a forensic social worker, testified in the 1993 post-conviction hearing. She would have testified that Storey's behavior was due to a poor environment beginning with his mother drinking while she was pregnant with Storey. The evidence that would support her testimony are the abuses and differences between Storey's brother, Keith's, upbringing and Storey's upbringing.

Counsel testified that she knew that Ms. Miller had been rejected as an expert in a prior case. *State v. Brown*, 998 S.W.2d 531, 549 (Mo. banc 1999). Trial counsel also testified that she had some conversations "that had caused me a little bit of concern, that I felt like she had some very strong opinions about this case and how it should be handled." She then testified, "It was my feeling and I think Dave Kenyon agreed that we wanted to get many of those stories told, but we wanted to have them told through people who were actually part of the stories...." The motion court found that "the 1993 PCR hearing court clearly found Ms. Miller's testimony to be flawed and not persuasive. The 'report' she issued was flawed. She was subject to cross-examination about these flaws."

### G. Dr. Pierce

Dr. Pierce would have tried to establish that Ms. Miller is an expert in forensic social work. As discussed, counsel decided to present Storey's mitigating evidence through Dr. Vandenberg. The motion court held: "Dr. Pierce has not evaluated nor visited with Mr. Storey. Dr. Pierce simply described the field of social work. Other than suggesting that Jill Miller's 'report' was 'good,' Dr. Pierce offered no relevant evidence."

### H. Counsel was not ineffective for not calling the experts discussed in subsections (A) to (G) of this point relied on.

Trial counsel is not ineffective for failing to shop for experts who will testify in a certain way. *State v. Mease*, 842 S.W.2d 98, 114 (Mo. banc 1992). Counsel's strategy was to rely on lay witnesses with a solid expert to tie everything together. Storey's counsel, Ms. Beimdiek, was responsible for the experts used during this trial. She testified that she does:

not like to use experts as a general rule.... I think my experience and my observations have been that there are just a very limited number of experts ... who can be persuasive to a jury ..., and I think that many times they do appear to be hired guns.... My preference, when possible is to rely on lay

witnesses to identify [anecdotal] evidence. That is, in my mind, more persuasive to a jury than an expert. . . .

The motion court found that counsel "contacted movant's original (and current) PCR counsel about the numerous experts who testified in movant's 199[3] PCR proceeding. Trial counsel was made aware of the reservations that PCR counsel had about the various experts. Additionally, the motion court . . . in 1993 specifically found that those experts were not credible. . . ." The motion court continued: "with regard to witnesses O'Donnell,[5] Straub, and Jolly, the 1993 motions court's findings lead to the conclusion that that court did not find them to be persuasive." The motion court further held:

> Calling all of the witnesses would be redundant and would likely alienate the jury by repeatedly seeking sympathy for [Storey's] upbringing. Trial counsel was clearly not ineffective in failing to call all of these experts. . . . Nor was counsel ineffective for failing to call any of his identified experts in addition to, or in lieu of Dr. Vandenberg. Drs. Cowan, Straub, Smith, Vliestra, in addition to Jill Miller, each failed to provide any testimony significantly different from Dr. Vandenberg.

Storey's family presented a vivid and often repeated history of child abuse from infancy. These witnesses testified that in spite of all this abuse, Storey really was a good person. Dr. Vandenberg then testified that this abuse to Storey caused him to be unstable, and to suffer from borderline personality disorder, alcohol dependency, and posttraumatic stress disorder. Dr. Vandenberg explained that Storey's personality disorder has emolliated over time, he is well-adapted to prison, and poses no threat to inmates or corrections employees. Finally, Dr. Vandenberg explained to the jury that Storey could not conform his actions to the requirements of the law because of an extreme mental or emotional disturbance. All of the other experts listed above would have testified to variations on this instability due to his childhood and familial influences. Storey has not shown that any of these experts, in any combination, "would have produced a viable defense." *State v. Harris,* 870 S.W.2d 798, 817 (Mo. banc 1994).

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not calling any of these experts to testify. *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996). "Trial strategy is not a ground for ineffective assistance of counsel." *State v. Chambers,* 891 S.W.2d 93, 109 (Mo. banc 1994). Storey has not shown prejudice because he has not shown a reasonable probability that had these experts testified, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

### XII.

Storey's eighth point relied on states:

> The motion court clearly erred denying death continued to be sought as a part of a larger pattern of prosecutorial misconduct throughout, and after *Storey I,* for the improper reasons Tim's case advanced Prosecutor Hulshof's 1996 Congressional campaign and his personal finances and Ms. Frey's family demanded Tim's case retried "as often as

5. Storey's claim that Dr. O'Donnell should have been called was held to have been defaulted by the motion court and was not raised before this Court.

necessary" to get death such that Tim was never afforded the opportunity to plead to life without parole....

Rule 29.15(a) states:

A person convicted of a felony after trial claiming that the conviction or sentence imposed violates the constitution and laws of this state or the constitution of the United States, including claims of ineffective assistance of trial and appellate counsel, that the court imposing the sentence was without jurisdiction to do so, or that the sentence imposed was in excess of the maximum sentence authorized by law may seek relief in the sentencing court pursuant to the provisions of this Rule 29.15.

Three different prosecutors sought the death penalty against Storey and three different juries assessed the death penalty against Storey. Storey's claim is not a recognized 29.15 claim. This point is frivolous and is denied.

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard,* 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App.1999).

## XIII.

■■■■ Storey's ninth point claims that his appellate counsel was ineffective for failing to raise several points on direct appeal. A defendant is entitled to effective assistance of appellate counsel. *Evitts v. Lucey,* 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

The standard for reviewing a claim of ineffective appellate counsel is essentially the same as that employed with trial counsel; movant is expected to show both a breach of duty and resulting prejudice. There is no duty to raise every possible issue asserted in the motion for new trial on appeal, and no duty to present non-frivolous issues where appellate counsel strategically decides to winnow out arguments in favor of other arguments[.]

*Mallett v. State,* 769 S.W.2d 77, 83 (Mo. banc 1989) (internal citations omitted). Relief from appellate ineffectiveness requires that the error not raised be "so substantial as to amount to a manifest injustice or a miscarriage of justice." *Moss v. State,* 10 S.W.3d 508, 514–15 (Mo. banc 2000).

### A. Admission of victim impact evidence

Storey claims that appellate counsel was ineffective by not appealing the trial court's decision "allowing any victim impact because it was prohibited at the time of the offense." Appellate counsel testified:

My understanding is that Payne versus Tennessee did allow victim impact evidence going to the jury, what kind of a person the victim was .... it was really a judgment call, and I interpreted that to include things that told about the life of Jill Frey.... It's a judgment call and I could have been wrong.

The motion court held: "Ms. Wafer stated that she did not raise the claim in her brief because it had not been raised at trial.... [S]he did not consider the issue prior to that.... Without some legal basis for believing this claim had merit under the law, counsel was not ineffective for failing to raise this issue...." This issue, admission of victim impact evidence, is dis-

cussed above in section VIII of this opinion. Appellate counsel did not err by not appealing the trial court's decision to allow victim impact.

### B. Exclusion of evidence about Keith's father

 Storey claims appellate counsel was ineffective for failing to appeal the trial court's ruling "excluding evidence of Keith Storey's ongoing relationship with his biological father to highlight the difference between Tim's and Keith's lives because it was relevant mitigation." The trial court prohibited Storey's mother from testifying about how Storey's brother, Keith, had an ongoing positive relationship with his father. Keith has a different father, and Storey did not have this same positive influence. Appellate counsel testified: "When I read the transcript I thought it was just minimal evidence about the kind of contact Keith had had with his father, and it really—it just didn't seem to me that it was a very strong point." The motion court held that counsel "made a reasonable decision of appellate strategy to not raise that issue on appeal." Because counsel's decision not to appeal the trial court's ruling was trial strategy, it "is not a ground for ineffective assistance of counsel." *State v. Chambers*, 891 S.W.2d 93, 109 (Mo. banc 1994).

### C. Admission of testimony about Storey invoking his right to counsel

 Storey claims that appellate counsel was ineffective by not appealing the trial court's decision "[a]llowing testimony about Tim invoking counsel because it was contrary to *Dexter* and *Zindel*." Officer Plummer testified that while he was interrogating Storey, he told Storey that he did not believe him. Storey agreed that he had been untruthful and said he would tell the police "what really happened," but "maybe I need to talk to a lawyer." Trial counsel objected to the testimony and raised it in a motion for new trial. Appellate counsel testified that it was an error for the officer to have mentioned the right, but was merely a quick reference and insignificant. Appellate counsel did not think it would require reversal. The motion court found that appellate counsel consciously decided not to raise it on appeal because it would not bring reversal. Because counsel's decision not to appeal the trial court's ruling was trial strategy, it "is not a ground for ineffective assistance of counsel." *Chambers*, 891 S.W.2d at 109.

### D. Refusal to allow Storey to waive jury trial

Storey claims that appellate counsel was ineffective for failing to appeal the trial court's decision "[r]efusing to allow Tim to waive a jury trial because Mo. Const. Art. I [Section] 22(a) does not require respondent's consent." Appellate counsel testified:

> [T]he defense raised the claim and I do not think the State consented, and the judge simply denied it. I mean, I since had subsequent thoughts about it. I might raise it now, try to, you know, challenge it as a denial of . . . the Missouri Constitution, but I certainly didn't think of that back then. I just felt as though there wasn't a valid claim.

The motion court held: "Counsel made a conscious decision to not raise the issue because the statute permitted such a waiver only by agreement by the State and no such agreement was in the record. Ms. Wafer was not ineffective for failing to raise the issue."

 Punishment is different than guilt. A "defendant has no constitutional right to have a jury assess punishment." *State v. Taylor*, 929 S.W.2d 209, 219 (Mo.

banc 1996). Section 565.006.3, RSMo 1993, provides: "If a defendant is found guilty of murder in the first degree after a jury trial ..., the defendant may not waive a jury trial of the issue of the punishment to be imposed, except by agreement with the state and the court." Storey exercised his right to a jury at the guilt phase of his trial and received a jury for his guilt phase. He did not have a right to waive a jury for punishment, *Taylor*, 929 S.W.2d at 219, and the State did not grant him the privilege. Appellate counsel did not err in deciding not to appeal this jury waiver claim.

### E. Admission of evidence regarding Storey's prior Georgia conviction

Storey claims that appellate counsel was ineffective for failing to appeal the trial court's decision "denying a new guilt phase because evidence of Tim's vacated Georgia conviction was highly prejudicial." At trial, Storey was impeached with evidence of a vacated prior conviction in Georgia. This was discussed by this Court in Storey's second appeal, and was held to have been harmless. *State v. Storey*, 986 S.W.2d 462, 465–66 (Mo. banc 1999). Appellate counsel testified that she "thought the issue had previously been presented to the Missouri Supreme Court and ruled on, and I didn't see any reason to raise it again." The motion court denied the ineffective assistance claim. It was not error for counsel not to raise this issue again before this Court.

### F. Appellate counsel was not ineffective regarding any of the allegations contained in subsections (A) to (E) of this point relied on.

Storey has not shown that appellate counsel made any errors. Victim impact was admissible at the time of Storey's trial. The trial court did not err in excluding evidence about Storey's brother. The witness comment that Storey had invoked his right to counsel was insignificant and not prejudicial. Storey had no right to waive a jury penalty trial. This Court had already held that the impeachment evidence that Storey had been convicted in Georgia was harmless. The complaints in this point relied on concern strategy decisions that appellate counsel made in order to focus the appeal on more solid issues.

Storey cannot meet his burden to show error "so substantial as to amount to a manifest injustice or a miscarriage of justice." *Moss*, 10 S.W.3d at 514–15. He has not shown prejudice or that had appellate counsel preserved any of these claims for appeal "the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted).

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard*, 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd*, 10 S.W.3d 546, 556 (Mo.App.1999).

### XIV.

Storey's tenth point claims that trial counsel was ineffective for failing to object to, and preserve for appeal, several comments made by witnesses at trial.

### A. Officer Plummer

 Storey claims that trial counsel was ineffective for failing to object to "[o]fficer Plummer testifying to Tim's interro-

gation statement he used to believe in the death penalty, but not anymore, because this injected irrelevant information engendering passion and prejudice suggesting that under Tim's own view death was appropriate[.]" Officer Plummer testified that Storey stated "he used to believe in the death penalty. He said he didn't believe in it anymore. He didn't think he should get off free."

Counsel, Kenyon, testified that he should have objected. "Actually, what I should have done was I should have filed a motion in limine requesting that that statement be excluded and that the prosecutor be instructed to instruct his witness to not bring that up." The 29.15 motion court held: "Movant's statement to Detective Plummer that he no longer believed in the death penalty can reasonably be interpreted as evidence of guilt, particularly when he followed it with the comment that movant did not feel 'he should get off free.' " Storey's comment can be interpreted as evidence of guilt. It was relevant to the penalty phase, and an objection to it would have been baseless. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *State v. Six,* 805 S.W.2d 159, 167 (Mo. banc 1991).

### B. Dr. Givon

■ Storey claims that trial counsel was ineffective for failing to object to "[Dr.] Givon making predictions on Tim's behavior once he was 'in a free community' because this suggested life without parole was actually paroleable[.]" At trial, Dr. Givon was asked "With regard to his antisocial personality disorder, it still exists, but what?" Dr. Givon answered:

Well, I changed the diagnosis to just a personality disorder not otherwise specified because he seemed to have mellowed some over the years. And I'm not certain that this disorder is com-

pletely gone and may not be reactive once he is in a free community. I felt that I should give him the benefit of the doubt. . . .

Counsel testified at the 29.15 hearing as follows:

I think that's misleading under the law under the facts that Tim had already been convicted of first-degree murder, he was never going to be out in the free community. And to make that suggestion would mislead jurors into thinking that was a potential outcome some day for Tim. . . . I missed—we should have objected to that or at the very least on cross-examination I should have cleared up with him that that wasn't a possibility in this case.

The motion court held: "The comment by Dr. Givon that movant challenges is insignificant and was not highlighted by the State."

This comment was not repeated and there is no evidence that the witness intended to suggest that Storey could be paroled. When compared with the evidence of guilt in this case, it is not reasonable to think that this comment was what made the jury give the death penalty. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted).

### C. Voir dire of Ms. Willis

■ Storey claims that trial counsel was ineffective for failing to object to "[r]espondent's voir dire about a punishment preference 'for people who go around committing murder first' because this suggested Tim committed other murders[.]" The following questioning of Ms. Willis occurred during voir dire:

Mr. Moss: Miss Willis, given our discussion so far, could you form the opinion that for killing Miss Frey, Storey should get the death penalty?

Ms. Willis: Yes

Mr. Moss: If you form that opinion, could you sign a verdict saying that?

Ms. Willis: Yes

Mr. Moss: Do you have a preference or leaning toward either punishment as the best punishment for people who go around committing murder first.

Ms. Willis: No

Mr. Moss: Will you hold the State to its burden?

Ms. Willis: Yes.

When asked why she did not object, counsel responded: "No strategy reason. We should have. I think that's an improper comment to make.... I think it suggests evidence of other crimes, that he has committed other homicides." The motion court held: "The comment requires a broad inference to be drawn from the State's comment in voir dire. Counsel was not ineffective in this regard." This Court agrees with the motion court. It would not be reasonable to think that the jury was misled by this comment into thinking that Storey had a history of murders. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

### D. Competency evidence

■■■ Storey claims that trial counsel was ineffective for failing to object to "Givon's testimony Tim was competent to proceed because it was irrelevant to the punishment decision[.]" Dr. Givon testified as follows:

Q. Did you proceed to determine insofar as possible ... whether or not he could cooperate with counsel and understood the proceedings against him?

A. Yes, I did.

Q. Did you do extensive interview questions of him?

MS. BIEMDIEK: I'll object at this point, this is improper rebuttal. This issue has not been raised in any part of defendant's case in chief.

. . . .

THE COURT: Overruled

. . . .

Q. All right. You questioned him extensively about his knowledge of legal proceedings and his ability to understand and cooperate fully with his counsel?

A. Yes, I did.

. . . .

When asked in the hearing why she did not object for relevancy, counsel testified: "I should have. That is the proper objection. Competency, once it's been determined that a defendant is competent [it] is not relevant, shouldn't really be mentioned in front of the jury." The motion court held: "The questions were not so improper or prejudicial as to mislead the jury. Trial counsel did object, but the objection was overruled. There is no merit to this claim." "As a general rule, the trial court has discretion during the punishment phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment." *State v. Storey,* 40 S.W.3d 898, 908 (Mo. banc 2001) (internal quotations omitted). It may be true that competency was not directly relevant to this part of the trial, but this testimony does not harm Storey, and the trial court had discretion to allow it. Counsel did not err by not objecting twice. Storey has not shown prejudice because he has not shown

a reasonable probability that had counsel objected to this comment, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

### E. Prison killings

Storey claims that counsel was ineffective for not objecting to "[c]ross-examination of corrections expert Aiken about prison killings at Jefferson City Correctional Center because it was irrelevant and the prosecutor made factually false representations about those killings which in addition constituted prosecutorial misconduct[.]"

The line of questioning was as follows:

Q. Are you aware in the same Jefferson City facility, an individual by the name of Bobby O'Neal killing a correctional officer?

MR. KENYON: Your Honor, I'm going to object to anymore questions pertaining to Jefferson City Correctional Center. Mr. Storey has been in Potosi Correctional Center, not the Jefferson City Correctional Center, it is irrelevant.

THE COURT: Overruled as to this question. You may answer if you can, sir.

. . . .

Q. Jefferson City is a maximum security and was a maximum security, remains always a maximum security facility for housing some of the worst inmates with the worst sentences. What I'm asking you, not unlike Potosi, those are the kind of people that are housed at Postosi. Are you aware of the murder of a correctional officer by Bobby O'Neal at the Jefferson City facility?

A. I do not have the particulars on that particular case.

Storey complains that the prosecutor mixed up the cases and that the inmate O'Neal actually killed another inmate and not a corrections officer. The motion court held:

> It is not reasonable to think that competent trial counsel would possess command of the facts of every reported Missouri death penalty case such that he or she could detect any variance in the facts in a question posed. There was no evidence that this variance was intentional by the State, nor is there any evidence to suggest this factual variance was prejudicial.

██ A question is not evidence and no prejudice results from questions that are not answered. *State v. Williams*, 652 S.W.2d 102, 110 (Mo. banc 1983). Counsel objected to the prosecutor's question and was overruled. This is a confusing line of questioning, but two objections were not necessary. The prosecutor asked the question, which was not factually accurate, and the witness did not answer. There was nothing left for counsel to object to. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

### F. Counsel was not ineffective regarding any of the allegations contained in subsections (A) to (E) of this point relied on.

The only one of these objections that was even arguable was Mr. Givon's statement, which implied that Storey could someday be paroled. As to the other claims, "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *Six*, 805 S.W.2d at 167.

Nowhere in this point relied on has Storey shown "that counsel's representation fell below an objective standard of reasonableness" by not objecting to any of these claims. *Williams v. Taylor*, 529 U.S. 362,

390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (citations omitted). Storey has not overcome the "strong presumption ... that trial counsel was effective...." *State v. Tokar,* 918 S.W.2d 753, 766 (Mo. banc 1996). As to Mr. Givon's statement, it was not highlighted, and simply was insignificant. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to it, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

## XV.

In the eleventh point relied on, Storey makes two claims that counsel was ineffective for failing to object to the prosecutor's closing arguments.

### A. Weakness argument

Storey claims that counsel was ineffective for failing to object to the prosecutor's argument that "[i]mposing life equated to weakness because that violated *Rousan* [.]" This issue was litigated in Storey's direct appeal. This Court quoted the exact same statements that Storey complains of in this point and held:

> "We have cautioned against any suggestion that the jury is weak if it fails to return a certain verdict. *State v. Rousan,* 961 S.W.2d 831, 851 (Mo. banc 1998). Nevertheless, 'a prosecutor is allowed to argue that the defendant does not deserve mercy under the facts of a particular case.' *Id.* In *Rousan,* the defense asked for mercy during closing arguments. The prosecutor then discussed the difference between mercy and weakness. He argued that the defendant did not deserve mercy under the facts of the case. In conclusion, he stated, 'The defense has asked you for mercy and what they are hoping for is weakness. I'm sorry. It's a hard choice.

> Weakness is something we can no longer afford. Do your duty. Thank you folks.' *Id.*
>
> As in *Rousan,* we find that the State's comment about weakness was isolated and part of a larger and otherwise appropriate argument. We can not say under the facts of this case that the trial court abused its discretion in overruling the defense objection or that there is a reasonable probability that the jury's verdict would have been different had the argument not been made."

*State v. Storey,* 40 S.W.3d 898, 911 (Mo. banc.2001). This was raised as part of Storey's prior appeal and cannot be relitigated, even on a different theory, during a post-conviction proceeding. *Mallett v. State,* 769 S.W.2d 77, 83 (Mo. banc 1989).

### B. Comparing Storey to Ms. Frey

▆ Storey also claims that counsel was ineffective for failing to object to the prosecutor's statement "[c]omparing the value of Ms. Frey's life to Tim's life which violated *Storey I.*" The prosecutor argued in the 1999 trial:

> I don't want to get into the business of measuring the value of one life against another, but I don't think there is any debate that Jill Lynn Frey was a fine woman. You know most of us in this life go through our lives and don't do a great deal of harm and we don't do a great deal of good either, but this woman was doing a lot of good. And another part of the tragedy is that that's been seized from us and taken from us.

When asked why she did not object to the prosecutors 1999 statements, counsel testified: "I'm not sure they are objectionable." The motion court held: "The state's closing argument did not attempt to weigh or compare the life of the victim against the movant's as occurred in the first trial. The state simply stated that Jill Frey was

a fine person—a reasonable and fair comment on the evidence."

The prosecutor had argued in Storey's 1995 case:

Why do we have a death penalty? The reason we have the death penalty is because the right of the innocent people to live outweighs—by huge leaps and bounds, outweighs the right of the guilty not to die. The right of the innocent completely outweighs the right of the guilty not to die, and, so, it comes down to one basic thing. Whose life is more important to you? Whose life has more value? The Defendant's or Jill Lynn Frey's?

*State v. Storey*, 901 S.W.2d 886, 902 (Mo. banc 1995). This Court granted post-conviction relief because of the 1995 statement and responded:

[E]ven if the process could be distilled to "one thing," it would not be "Whose life is more important to you? Whose life has more value?" In truth, "There is one principle . . .: The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision."

*Id.* Even a cursory reading of these two arguments illustrates the profound difference between them. In this case, the prosecutor's statement did not mischaracterize the law, and "[c]ounsel is not deemed ineffective for declining to make a non-meritorious objection." *State v. Six*, 805 S.W.2d 159, 167 (Mo. banc 1991). Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not objecting. *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "pre-

sumption that counsel's alleged omissions were sound trial strategy." *Id.* at 766. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected, "the result of the proceeding would have been different." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495.

## XVI.

In his twelfth point relied on, Storey argues counsel was ineffective for:

failing to properly object to and preserve: (A) The prosecutor's voir dire burden of proof shifting and contrary to the MAI instructions representations telling the jury it would have to unanimously find life without was appropriate; (B) The prosecutor's voir dire there would come a time in deliberations when satisfying beyond a reasonable was not required when that is always respondent's burden; (C) Tim's guilt conviction was obtained when intoxication instruction MAI–CR3d 310.50 was given contrary to *Erwin*. . . .

### A. Prosecutor's statement that jury must unanimously choose life without parole

First, Storey claims: "The prosecutor's voir dire burden of proof shifting and contrary to the MAI instructions representations telling the jury it would have to unanimously find life without was appropriate." This claim is difficult to understand, but seems to complain that counsel was ineffective for not preserving, for appeal, the prosecutor's argument that the jury needed to find unanimously in order to sentence Storey to life imprisonment.

While questioning the foreperson, the prosecutor said:

"I will tell you that while the jury must unanimously find that death penalty is appropriate, in fact, the jury would have to unanimously find that life with-

out parole is appropriate, it must be unanimous either way if it is to so find—
MS. BEIMDIEK: Your Honor, I'll object, it is a misstatement of the law.
MR. AHSENS: No. it isn't.
THE COURT: I'm going to overrule the objection."

Counsel objected to this statement at trial and was overruled. When asked why she did not include it in the motion for new trial, she testified: "It should have been included. I don't think there is a strategic reason for not having included that." The 29.15 motion court held: "Counsel objected and was overruled. There is nothing in the questioning that denied movant a fair trial. Counsel was not ineffective in failing to preserve this issue."

■ In *State v. Clay*, the defendant complained that the prosecutor, during voir dire, told the jury that a verdict for life imprisonment required a unanimous verdict. 975 S.W.2d 121, 135 (Mo. banc 1998). This Court held, in *Clay*, "Nor was appellant harmed by the prosecution's comments that the verdict had to be unanimous." *Id.; see* section 565.030.4, RSMo 1994. Storey presents a very similar claim, to which, counsel objected and was overruled. For the same reasons explained in *Clay*, Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to counsel's comment, "the result of the proceeding would have been different." *Williams v. Taylor*, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

## B. Prosecutor's statement about burden of proof

Storey claims that counsel was ineffective for failing to object to: "The prosecutor's voir dire there would come a time in deliberations when satisfying beyond a reasonable was not required when that is always respondent's burden." During voir dire, the prosecutor told the jurors that after weighing aggravating and mitigating factors, "you reach a point where you are no longer talking about matters being proven beyond a reasonable doubt. It is simply a matter of deciding what the penalty should be." Storey argues that the prosecutor, in effect, told the jury the State's burden was not always beyond a reasonable doubt and that counsel was ineffective for failing to object.

In *State v. Tokar*, 918 S.W.2d 753, 769–70 (Mo. banc 1996), the Court held that a prosecutor's analogy during voir dire was not improper. In that case, the prosecutor described a hallway with three doors, where the first door represented the State's burden of proof on the defendant's guilt and the second door represented the State's burden of proof regarding the existence of at least one aggravating circumstance that warrants the death penalty. *Id.* at 769. If the State met its burden at the first two doors, the third and final door would have represented a decision on a death sentence. *Id.* This Court held: "Considering the analogy with the closing arguments as a whole, there was no plain error in explaining the jurors' decision-making process in this way." *Id.* at 770 (citing sections 565.030 and 565.032).

During voir dire of Storey's 1999 sentencing trial, the prosecutor stated:

Now mitigating circumstances lessen the severity of crime, assuming that you believe them and you think that they should be given some weight and whether you believe them and how much weight you should give them is up to you; is that clear?

However, the defense does not have to prove any of those things beyond a reasonable doubt nor do they ever have to prove anything. The only thing that you, that—if you believe those things

are true, you will then weigh them against all of the mitigating—that is mitigating factors outweigh the aggravating factors.

After you go through that weighing process, you reach a point where you are no longer talking about matters being proved beyond a reasonable doubt. It is simply a matter of deciding what the penalty should be. I'm going to call that the final point, I'm going to call it the final point of decision, if I may. . . .

■■■ When asked why she did not preserve this for appeal, counsel Beimdiek testified:

I think we should have. I think that I find those instructions extremely confusing, especially what we call step three, the weighing of the mitigators and aggravators, and burden of proof. . . . So I think in hindsight it is something that is right for preservation, should have been objected to and included in the motion for new trial.

Counsel Kenyon testified:

"I don't believe those remarks to be inaccurate. . . . What the prosecutor was referring to was the fourth step, when you talk about four steps in the penalty phase process. My understanding of what the prosecutor was saying from listening to him, the prosecutor was talking about that very fourth step. And in the fourth step, there is no language with respect to that fourth step itself that requires the state to prove anything beyond a reasonable doubt.

The proof beyond a reasonable doubt language is in the first two steps. . . . And because it wasn't confusing to me and I believed it to be a correct statement of the law, I didn't object."

The motion court held: "Counsel indicated that the questioning by the state was not so obviously improper that counsel was ineffective in failing to object. Nor does the court find it so misleading or prejudicial as to have denied movant a fair trial or an impartial jury." There is no claim here. In the context of the prosecutor's argument, it is very clear that the state must prove its case beyond a reasonable doubt. In the context of the statement, it is also true that the concept of reasonable doubt does not apply to weighing aggravating and mitigating factors. Counsel made no error by not objecting.

### C. MAI–CR 3d 310.50 intoxication instruction

Storey claims that counsel was ineffective in failing to object that "Tim's guilt conviction was obtained when intoxication instruction MAI–CR3d 310.50 was given contrary to *Erwin.*" This claim is that counsel for the 1999 penalty retrial did not object, in 1999, that the instruction had been given in Storey's 1991 guilt phase.

In the 1991 guilt phase, the jury was given the following instruction, based on MAI–CR 3d 310.50: "In determining the defendant's guilt or innocence, you are instructed that an intoxicated or drugged condition whether from alcohol or drugs will not relieve a person of responsibility for his conduct." Two years later, this Court held MAI–CR 3d 310.50 violated due process, but limited the holding to cases tried in the future and cases then subject to direct appeal where the issue had been preserved. *State v. Erwin,* 848 S.W.2d 476, 484 (Mo. banc 1993).

■■■ In Storey's first appeal, this Court held:

Storey was tried before *Erwin* was decided, and concedes there was no trial objection nor any error alleged in the new trial motion. Thus, the claim was waived. Rule 28.03.

Storey also claims that trial counsel was ineffective for failing to preserve

the issue, even though he was tried before *Erwin* was decided. This argument is again rejected. *See State v. Chambers,* 891 S.W.2d 93, 106 (Mo. banc 1994).

*State v. Storey,* 901 S.W.2d 886, 897 (Mo. banc 1995). When asked why no objection to this was made during the retrial of the penalty phase, Counsel Beimdiek testified: "I don't think we considered it. I think we probably should have raised that objection." Counsel Kenyon testified: "It was an oversight on my part. I was focused on the penalty phase of this case. It was a penalty phase retrial and I wasn't looking for issues that pertained to reversing his guilt phase." The 29.15 motion court held, in 2004, "The issue was raised in the 1993 PCR and movant was not successful. Trial counsel cannot be deemed ineffective for failing to raise an issue that was already raised without success." This issue has been litigated by Storey before and without success. "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *State v. Six,* 805 S.W.2d 159, 167 (Mo. banc 1991).

### D. Counsel is not ineffective regarding any of the allegations contained in subsections (A) to (C) of this point relied on.

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by not raising these three claims. *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption ... that trial counsel was effective...." *Tokar,* 918 S.W.2d at 761. These claims have no merit. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to these claims, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

The rest of the language in this point relied on "preserves nothing for appellate review" because it "does not state 'wherein and why' the trial court erred" and "does not comply with Rule 84.04(d)." *Avis Rent–A–Car Sys., Inc., v. Howard,* 133 S.W.3d 122, 123 (Mo.App.2004); *see Thummel v. King,* 570 S.W.2d 679, 685 (Mo. banc 1978). It "preserves nothing for appellate review" because it "cannot be comprehended without resorting to other portions of the brief." *State v. Dodd,* 10 S.W.3d 546, 556 (Mo.App.1999).

### XVII.

Storey's last point relied on states: "Tim was denied his rights to effective assistance of counsel when counsel failed to object and present evidence to challenge the penalty instructions as failing to properly guide the jury...."

█ A study was conducted by Dr. Wiener, which concluded that MAI instructions are confusing to a jury because of the language used in them. Dr. Wiener reviewed Storey's instructions and concluded that juror comprehension would have been no better in Storey's case than in the study. The motion court held:

> [Storey] asserts that counsel should have argued that the jury instructions were unconstitutional based on a supposed scientific study by Dr. Richard Wiener. Dr. Wiener's study and a previous deposition were proffered.... Counsel was aware of Dr. Wiener's research. The Court finds Dr. Wiener's research biased and flawed. His testimony is not credible and trial counsel was not ineffective in failing to raise this issue. No court has found this challenge to have merit and the only reported case denied a similar claim. *Free v. Peters,* 12 F.3d 700[, 704–05] (7th Cir.1993).

. . . .

Storey points to nothing specific about the instructions that was confusing to the jury, but instead argues generally that all death penalty instructions are flawed, so naturally the instructions in his case must have been flawed. Storey cites no other case in his brief to support this claim. *Free* is the only case discussed, and in that case the Seventh Circuit specifically rejected a similar study. *Id.* "Counsel is not deemed ineffective for declining to make a non-meritorious objection." *State v. Six,* 805 S.W.2d 159, 167 (Mo. banc 1991).

Storey has not shown "that counsel's representation fell below an objective standard of reasonableness" by failing to object to the jury instructions based on Dr. Wiener's study. *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal citations omitted). Storey has not overcome the "strong presumption . . . that trial counsel was effective. . . ." *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996). Storey has not overcome the "presumption that counsel's alleged omissions were sound trial strategy." *Tokar,* 918 S.W.2d at 766. Storey has not shown prejudice because he has not shown a reasonable probability that had counsel objected to the instructions, "the result of the proceeding would have been different." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

## XVIII.

A summary of what the jury considered will put this Court's denial of post-conviction relief into perspective. The jury heard how Storey struck Ms. Frey a minimum of twenty times before cutting her throat to the spine. They heard how the next day he returned to her apartment, wiped it down, scrubbed Ms. Frey's fingernails, and attempted to remove any other incriminating evidence. They heard that when the police found her body, she was lying face down in a pool of blood, naked below the waist, with her arms behind her back. The walls were splattered with blood and her shirt had a tennis shoe imprint on it. They heard that the police found Storey's bloody palm print in the room. They heard that the police found Ms. Frey's briefcase along with a paper bag, which contained a bloody t-shirt, a tank-top, and a pair of white gloves. They heard that Ms. Frey's blood was on the gloves, Storey's blood was on the t-shirt, and Storey's sneakers also had blood on them.

The jury then heard the testimony of 10 mitigating witnesses. These witnesses presented evidence about all of the bad influences and discord that surrounded Storey's childhood. Finally, the jury heard evidence from these witnesses about Storey's good deeds and friendly disposition.

This Court rejects all of Storey's points. "The question is whether, when all the mitigation evidence is added together, is there a reasonable probability that the outcome would have been different?" *Hutchison v. State,* 150 S.W.3d 292, 306 (Mo. banc 2004). The defendant "must show that, but for his counsels' ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted." *Rousan v. State,* 48 S.W.3d 576, 582 (Mo. banc 2001). Simply put, there is no reasonable probability that had every single thing Storey complains about been otherwise, "the result of the proceeding would have been different". *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495 (2000) (internal citations omitted). When all of the evidence is viewed together, in this case, there is no question that the jury sentenced Storey to death because of his

horrendous murder and not because counsel did not object more often or complain about any of the claims in these points relied on, in any combination.

The motion court's findings are presumed to be correct. *Black v. State*, 151 S.W.3d 49, 54 (Mo. banc 2004). The motion court simply did not "clearly [err] in making its findings of fact and conclusions of law" regarding the claims raised by Storey. *Skillicorn v. State*, 22 S.W.3d 678, 681 (Mo. banc 2000), *cert. denied*, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000). This Court is not "left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000).

The judgment is affirmed.

All concur.